Appellant, LMV-AL VENTURES, LLC // Cross-Appellants, Texas Department of Aging and Disability Services and Commissioner Jon Weizenbaum, in his Official Capacity

v.

Appellees, TEXAS DEPARTMENT OF AGING AND DISABILITY SERVICES and Commissioner Jon Weizenbaum, in his Official Capacity // Cross-Appellee, LMV-AL Ventures, LLC

NO. 03–16–00222–CV

Court of Appeals of Texas, Austin.

Filed: April 6, 2017

Ari Cuenin, Office of the Attorney General, Eugene A. Clayborn Administrative Law Division, Austin, TX, for appellee.

John H. Modesett, III, Walter V. Williams, Modesett Williams, PLLC Austin, TX, for appellant.

Before Justices Puryear, Pemberton, and Field

## OPINION

David Puryear, Justice

Appellant and cross-appellee LMV–AL Ventures, LLC sued appellees and cross-appellants Texas Department of Aging and

Disability Services and Commissioner Jon Weizenbaum, in his official capacity (collectively "DADS"), for declaratory judgment under the Uniform Declaratory Judgments Act ("UDJA") and the Administrative Procedures Act ("APA"). *See* Tex. Civ. Prac. & Rem. Code §§ 37.001–.011 (UDJA); Tex. Gov't Code § 2001.038 (suit for declaratory judgment under APA). LMV sought declarations that would compel DADS to license thirty rooms in LMV's recently constructed memory-care facility for double-occupancy use. DADS filed a plea to the jurisdiction, and DADS and LMV filed competing motions for summary judgment. The trial court granted summary judgment in favor of DADS. LMV appeals from the trial court's order granting summary judgment for DADS. DADS filed a cross-appeal complaining of the trial court's implied denial of its plea to the jurisdiction. We reverse and render judgment dismissing LMV's claims for declaratory judgment under the APA and the UDJA for want of jurisdiction. We affirm the trial court's granting of summary judgment on LMV's constitutional due process claims.

## Factual and Procedural Background

LMV built an assisted living and memory-care facility, known as a "Type B" facility,[1] 40 Tex. Admin. Code § 92.3(c) (2016) (Tex. Dep't of Aging & Disability Servs., Types of Assisted Living Facilities), seeking approval for seventy-three beds in the memory-care portion of the facility.[2] Rule 92.62 sets out the general requirements for a Type B assisted living facility, such as evacuation procedures, construction elements, fire alarm and sprinkler systems, sanitation requirements, and details about the residential accommodations. *See id.* § 92.62 (2016) (General Requirements). Central to this case is Rule 92.62(m)(1)(B) ("Rule 92.62"), which governs the size of bedrooms in a Type B facility and provides:

> Bedroom usable floor space for Type B facilities must be not less than 100 square feet per bed for a single-bed room and not less than 80 square feet per bed for a multiple-bed room. A bedroom for a person with a physical disability or mobility impairment must meet accessibility standards for access around the bed or beds, which is a minimum of 3'–0" clear width for access aisles. A bedroom must not be less than ten feet in the smallest dimension unless specifically approved by DADS.

*Id.* § 92.62(m)(1)(B).

LMV sought to place seventy-three beds in the forty-three rooms in the memory-care portion of its facility, making thirty rooms double-occupancy rooms. DADS denied double-occupancy for the thirty rooms in question and instead approved all the rooms for single occupancy, allowing forty-three beds total instead of the requested seventy-three. Each of the thirty rooms

---

1. A Type B facility provides care for residents who may require assistance to evacuate, during nighttime sleeping hours, or emergency conditions. 40 Tex. Admin. Code § 92.3(c) (2016) (Tex. Dep't of Aging & Disability Servs., Types of Assisted Living Facilities). To provide care for Alzheimer's patients, a facility must be a Type B facility and must meet a specific set of standards for staffing, admission processes, activities for the residents, and the physical plant itself. *Id.* § 92.51 (2016) (Licensure of Facilities for Persons with Al-

zheimer's Disease), § 92.53 (2016) (Standards for Certified Alzheimer's Assisted Living Facilities). The specific dimensions and usable floor space required in an Alzheimer's patient's bedroom is the same as in a general Type B facility.

2. LMV sought approval for a total of 256 beds—183 of the beds in the assisted living portion of the facility and seventy-three in the memory-care portion.

that received approval for single occupancy rather than double occupancy had substantially the same configuration (or the mirror image of it), as illustrated by this drawing from the record:

The drawing depicts a bathroom in the lower left-hand corner and an entryway in the lower right. In the upper left corner of each room is a two-foot, ten-inch square "niche," marked on the drawing with an "X," in which LMV installed a vertical heating and air conditioning unit ["HVAC"].[3] Although some areas of the room, such as the entryway or the eight-foot, ten-inch[4] portion underneath the HVAC unit in the drawing above, are less than ten feet long, the main area of the room, excluding those areas, is a rectangle eleven-feet, eight-inches by eleven-feet, ten-inches, amounting to 138.8 square feet, which would independently satisfy the requirement that a "bedroom must not be less than ten feet in the smallest dimension." *See id.*

DADS viewed the 138.8 square-foot rectangle both as satisfying the minimum dimensions for a "bedroom" and as the only space in the room that can be considered "bedroom usable floor space." *See id.* Under its calculation, the square footage of the rooms exceeded the minimum for single occupancy (100 square feet) but did not meet the minimum for double occupancy (80 square feet per bed), and, therefore, DADS refused to approve the rooms for anything other than single occupancy.

LMV, on the other hand, insisted that Rule 92.62's ten-foot minimum dimension

---

3. LMV used more costly vertical units "to prevent male residents' inadvertent use of the more typical horizontal [HVAC] units as a toilet (a recognized problem with male Memory Care residents)."

4. For purposes of this opinion, we will round fractions of an inch up or down as appropriate.

requirement should be considered independently from DADS's calculation of "bedroom usable floor space minimum" and that DADS was thus obligated to include in its calculation additional portions of the room that LMV would consider "usable" floor space. LMV argued that the two-foot, ten-inch by eight-foot, ten-inch portion below the HVAC niche in the drawing above (referred to as "the inset" and comprising 25.1 square feet), was "usable floor space" because it was large enough to accommodate furniture like a couch or a dresser and, therefore, should have been included in DADS's calculations. Were that additional space included in the "usable floor space" calculation, LMV observed, it would result in each room having slightly more than the minimum floor space for double occupancy. In the alternative, LMV asked DADS to exercise its discretion to include the insets in its calculations.

When DADS declined to include the insets' square footage, LMV sued, asserting chiefly: that DADS exceeded its authority in excluding the insets; that DADS's interpretation excluding the floor space amounted to an improperly promulgated rule; that hewing to such an improper rule amounted to an ultra vires act; and that DADS's interpretation violated LMV's due process rights. LMV moved for summary judgment, arguing that the phrase "usable floor space" was unambiguous and should be given its ordinary meaning and, alternatively, that if the phrase was ambiguous, DADS's interpretation was arbitrary and capricious. LMV continued to insist that DADS's interpretation amounted to a rule that had not been promulgated in compliance with the APA's rulemaking process and that it violated LMV's due process rights.

DADS filed a plea to the jurisdiction, asserting that LMV had not established jurisdiction through a waiver of sovereign immunity. DADS contended that LMV did not have a protected interest in obtaining double-occupancy licensing, that LMV was not complaining of ultra vires acts but was seeking to control DADS's exercise of its discretionary authority, that LMV's UDJA claims sought a redundant remedy, that DADS's interpretation of its rule was proper and not an ultra vires act, and that section 2001.038 of the government code did not waive DADS's sovereign immunity over these claims. In addition to its plea to the jurisdiction, DADS also sought summary judgment on the merits, arguing that its interpretation and application of its rule governing the minimum dimensions and "bedroom usable floor space" for a memory-care room were consistent with the rule's plain language and the governing statutes and not plainly erroneous and thus entitled to the trial court's deference.

Following a hearing, the trial court signed an order denying LMV's motion for summary judgment, granting DADS's motion for summary judgment, sustaining DADS's objections to an affidavit by Paul DeNucci, managing member of LMV, as to three specific paragraphs, and overruling DADS's objections to three other paragraphs. This appeal and cross-appeal followed.

## Standard of Review

Because it implicates jurisdiction and is dispositive of the appeal, we first consider DADS's cross-appeal, in which it asserts that the trial court should have granted its plea to the jurisdiction on LMV's claims under the UDJA and the APA.

A plea to the jurisdiction challenges the trial court's subject-matter jurisdiction to decide claims for relief. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). In reviewing a trial court's decision on a plea to the jurisdiction, we look to the claimant's live

pleadings to see whether the claimant carried its burden of alleging facts affirmatively demonstrating the trial court's jurisdiction to hear the cause. *Id.* at 226. When a governmental entity's plea to the jurisdiction challenges the existence of jurisdictional facts, the trial court and the appellate courts should "consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised." *Id.* at 227. This is true even when the merits of a claimant's claims overlap with the jurisdictional issues. *See Slay v. Texas Comm'n on Envtl. Quality,* 351 S.W.3d 532, 545 (Tex. App.–Austin 2011, pet. denied) (overlap between merits and jurisdictional inquiry does not bar decision of jurisdictional issues, "although the existence of such overlap may impact the procedures courts use" in examining evidence).

As a general rule, the judiciary lacks the authority to review administrative agency actions:

> For well over 150 years, we have recognized the Legislature's authority to limit judicial review of executive actions. In 1859, we explained: "No principle is more firmly established, than that where a special and exclusive authority, is delegated to any tribunal or officer of the government, and no mode of revising his decision, by appeal or otherwise, is provided by law, his action is final and conclusive, of the matter submitted to his decision."

*Morath v. Sterling City Indep. Sch. Dist.,* 499 S.W.3d 407, 412 (Tex. 2016) (quoting *Keenan v. Perry,* 24 Tex. 253, 261 (1859)). In other words, "[i]t is well recognized under Texas law that there is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right." *Continental Cas. Ins. Co. v.*

*Functional Restoration Assocs.,* 19 S.W.3d 393, 397 (Tex. 2000); *see In re Office of the Attorney Gen.,* 456 S.W.3d 153, 157 (Tex. 2015) (per curiam). Thus, "[o]ur analytical starting point is that sovereign immunity generally deprives courts of subject-matter jurisdiction to review" agency actions absent a legislatively granted right to judicial review. Keystone RV Co. v. Texas Dep't of Motor Vehicles, 507 S.W.3d 829, 831 (Tex. App.–Austin 2016, no pet.). Immunity may be waived by the legislature, but such a waiver must be clear and unambiguous, and we "read statutory immunity waivers narrowly." *Id.* at 832; *see* Tex. Gov't Code § 311.034 ("a statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language").

### Jurisdiction under the APA

The APA waives governmental immunity for a suit for declaratory judgment challenging the "validity or applicability of a rule" when "the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege." Tex. Gov't Code § 2001.038(a). The parties do not dispute that Rule 92.62 itself was properly promulgated or that Rule 92.62 can be applied to LMV's facility. However, LMV argues (1) that DADS's "interpretation" includes requirements not actually included in Rule 92.62 and thus amounts to a new "rule" that is invalid because it was not properly promulgated under the APA, and (2) that its challenge to how DADS applied Rule 92.62 is an "applicability" challenge under the APA, so as to come within section 2001.038's waiver of immunity. In its cross-appeal, DADS argues that LMV did not challenge the "validity or applicability" of Rule 92.62 so as to allow for jurisdiction under section 2001.038 of the APA; that DADS's interpretation of Rule 92.62 is not a new or "secret" rule that was not pro-

mulgated in accordance with the APA; that challenging an agency's interpretation of a rule does not suffice to invoke jurisdiction under section 2001.038; that LMV's "putative right to 30 additional Alzheimer's beds" was not a "legal right or privilege" within the meaning of section 2001.038; and that the declaration sought by LMV under section 2001.038 would not redress its alleged injury.

We first decide whether DADS's interpretation of Rule 92.62 is in itself a "rule" that was not properly promulgated under the APA and then consider whether LMV properly challenged Rule 92.62 under the APA.

### Did DADS's Interpretation of Rule 92.62 Amount to a "Rule"?

"Under the APA, a rule: (1) is an agency statement of general applicability that either 'implements, interprets, or prescribes law or policy' or describes [an agency's] 'procedure or practice requirements'; (2) 'includes the amendment or repeal of a prior rule'; and (3) 'does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.'" *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 714 (Tex. 2008) (quoting Tex. Gov't Code § 2001.003(6)). Pronouncements by an agency "that advise third parties regarding applicable legal requirements ... may be 'interpretations' of law that constitute 'rules' under the APA," but an informal agency statement that merely restates formally promulgated rules is not. *Texas Dep't of Transp. v. Sunset Transp., Inc.*, 357 S.W.3d 691, 703 (Tex. App.–Austin 2011, no pet.).

In *Teladoc, Inc. v. Texas Medical Board*, the Board sent a letter to Teladoc and the Texas Medical Association, the "statewide association representing the Texas medical profession," stating that doctors who participated in Teladoc's network put their medical licenses at risk and that Teladoc's services ran afoul of certain administrative rules. 453 S.W.3d 606, 608–11 (Tex. App.–Austin 2014, pet. denied). The Board criticized Teladoc's advertising, which stated that its doctors could provide medical services over the telephone without having established a prior doctor-patient relationship in a face-to-face exam and that its telephone consultations were not "telemedicine." *Id.* at 608–09. Teladoc sued under section 2001.038, asserting that the Board's letter, while purportedly construing its rules, amounted to a rule not promulgated under the APA. *Id.* at 612. We discussed whether the letter should be considered a "rule," asking whether its pronouncements "should be considered to have any legal effect or significance independent of what is already contained in" the administrative rule in question. *Id.* at 616. We compared the language of the rule to the Board's letter and concluded that the letter was in itself a "rule" because it did not "track" the rule's language but instead "depart[ed] from and effectively change[d] that text." *Id.* at 620.

Similarly, in *Texas State Board of Pharmacy v. Witcher*, we held that the Board's application of a reciprocal-sanctions policy, suspending a pharmacist's license in Texas for as long as her license in North Carolina was suspended, was a "rule" within the meaning of the APA and not merely an "internal practice[ ] intended to promote consistency in the assessment of administrative penalties." 447 S.W.3d 520, 527, 533–34 (Tex. App.–Austin 2014, pet. denied). We noted that the policy elevated one of several discretionary "aggravating factors" listed in another rule "as an outcome-determinative factor," thereby "either constitut[ing] a modification of that rule or the establishment of a new rule"

*Id.* at 533. Because the policy would apply statewide and the Board would not be free to disregard it in future cases, we held that the "informally announced reciprocal-sanctions policy constitutes an agency 'rule' as that term is defined in the APA" and that, because it was not adopted in accordance with the APA, it was invalid. *Id.* at 533–35.

In this case, by contrast, DADS's interpretation does not amend Rule 92.62, create a new rule, or impose new requirements. Rule 92.62 provides that, unless otherwise approved by DADS, a bedroom "must not be less than ten feet in the smallest dimension" and that the "bedroom usable floor space" in a multiple-bed room must be at least eighty square feet per bed. 40 Tex. Admin. Code § 92.62(m)(1)(B). The plain and unambiguous language of the rule includes parallel requirements for minimum "bedroom usable floor space" and minimum room dimensions, which must be read in conjunction with each other. *See Jaster v. Comet II Constr., Inc.*, 438 S.W.3d 556, 562 (Tex. 2014) (courts must consider statute as whole rather than as isolated provisions and should read statute " 'contextually' " to give effect to every word, clause, and sentence (quoting *In re Office of Attorney Gen.*, 422 S.W.3d 623, 629 (Tex. 2013); *TGS–NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011))); *TGS–NOPEC*, 340 S.W.3d at 438–39 (rules are interpreted under same traditional principles of statutory construction applied to statutes; if statute is unambiguous, courts generally adopt interpretation "supported by its plain language," considering statute as whole rather than as isolated provisions); *Mid–Century Ins. Co. v. Ademaj*, 243 S.W.3d 618, 621 (Tex. 2007) (when interpreting statute, courts should begin with plain language, derived from entire act and not just isolated portions, and should read statute as whole and interpret so as to give effect to every part (quoting

*State ex rel. State Dep't of Highways & Pub. Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002))). Specifically, the third sentence of Rule 92.62 requires that a "bedroom" must be at least ten-feet by ten-feet in its dimensions and uses parallel phrasing of *"bedroom usable floor space"* in the first sentence. The import of this usage and structure is that "bedroom usable floor space" unambiguously requires that a "bedroom" have no dimension of less than ten feet.

Accordingly, we hold that in excluding the inset's square footage from its "bedroom usable floor space" calculation, DADS did not apply an improperly promulgated "rule." We sustain DADS's cross-appeal arguments related to LMV's claims of "secret" rulemaking.

### *Section 2001.038 Jurisdiction*

■ We next consider whether the trial court had jurisdiction over LMV's challenge to DADS's interpretation of Rule 92.62 pursuant to APA section 2001.038. To answer that question, we must consider the difference in the meanings of "applicability" versus "application" in the context of section 2001.038.

As stated earlier, the APA waives governmental immunity for a suit challenging "[t]he validity or applicability of a rule" when the rule or its threatened application will interfere with, impair, or threaten to interfere with or impair a legal right or privilege. Tex. Gov't Code § 2001.038(a). The parties do not contest that Rule 92.62 was promulgated pursuant to the APA. Thus, to determine whether the trial court could exercise jurisdiction over LMV's claims, we first determine what it means to challenge the "applicability" of a rule and whether LMV's complaints about DADS's interpretation of the rule in the context of its review of LMV's facility amount to an

applicability challenge sufficient to invoke jurisdiction under section 2001.038.

Section 2001.038 is frequently invoked to test the validity of a rule, whether promulgated as a formal rule or in some other guise.[5] As recognized by commentators, the word "applicability" is less than crystal clear. *See* 2 Ronald L. Beal, Texas Administrative Practice & Procedure, § 12.1 (2016) (noting that "legislative intent as to 'applicability' has been more troublesome" than validity challenge and stating that "[a] broad reading of the term could be that the legislature intended an applicability challenge anytime the issue arose as to whether a particular rule applied to a particular person or entity based on their peculiar circumstances").

In addition, this Court's language has at times muddled the question of exactly what an applicability challenge may be used for. In *ElderCare Properties, Inc. v. Texas Department of Human Services*, a nursing home sued, arguing that the Department should not have applied a waiver rule to a competing nursing home. 63 S.W.3d 551, 557–58 (Tex. App.–Austin 2001, pet. denied), *abrogated on other grounds, Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170 (Tex. 2004). The Court observed that the plaintiff was not seeking a declaration of "whether the waiver rule was properly applied to it" and thus "confine[d] our analysis to whether the rule is constitutionally valid." *Id.* at 558. However, in making that holding, the opinion stated that "an applicability challenge does not question the overall validity of a rule, 'but supplies the petitioner with the opportunity to obtain a judicial declaration of *the application of an existing administrative rule to his particular fact situation.*' " *Id.* (emphasis added, quoting Bob E. Shannon & James B. Ewbank, II, The Texas Administrative Procedure & Texas Register Act Since 1976—Selected Problems, 33 Baylor L.Rev. 393, 421 (1981)).[6] Later opinions referred to that statement in *ElderCare Properties* as support for the propositions that an applicability challenge allows a party "the opportunity to obtain a judicial declaration of the *implementation of the rule to its particular fact situation*," *City Public Serv. Bd. v. Public Util. Comm'n*, 96 S.W.3d 355, 359 (Tex. App.–Austin 2002, no pet.) (emphasis added), or "seeks a judicial declaration regarding the *application of the rule in a particular fact situation*," *City of Alvin v. Public Util. Comm'n*, 143 S.W.3d 872, 879 (Tex. App.–Austin 2004, no pet.) (emphasis added). Because this Court's language has at times been less than clear or consistent as to what an applicability challenge may accomplish, the meaning of "applicability" under

**5.** *See, e.g., Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 718 (Tex. App.–Austin 2009, no pet.) (suit challenged validity of Comptroller's letters, which were asserted to amount to rule); *Brinkley v. Texas Lottery Comm'n*, 986 S.W.2d 764, 767 (Tex. App.–Austin 1999, no pet.) (suit challenged agency's letters, which were alleged to constitute rule).

**6.** The commentators in the article cited by *ElderCare Properties* stated that a court has jurisdiction over a suit related to the "application of an existing administrative rule to [the petitioner's] particular fact situation" and then explained that such suits "only contest the applicability of a rule" and that the petitioner must "show why a rule does or does not apply to his predicament." Bob E. Shannon & James B. Ewbank, II, The Texas Administrative Procedure & Texas Register Act Since 1976—Selected Problems, 33 Baylor L.Rev. 393, 421–22 (1981). They then provided more clarity by setting out an example of a proper applicability challenge in which the petitioner might seek a declaratory judgment as to whether a rule that required a certificate of public necessity before implementation of a certain kind of system would apply when the petitioner was merely conducting a trial of such a system. *Id.* at 425–26.

section 2001.038 should be reexamined in light of contemporary understandings of the principles guiding statutory construction and waivers of sovereign immunity.

■ Section 2001.038 is a waiver of immunity and, therefore, is strictly construed in favor of retained immunity. *See Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012) ("We have repeatedly affirmed that any purported statutory waiver of sovereign immunity should be strictly construed in favor of retention of immunity."). In construing a statute, we look to its language, "apply the plain meaning of those words 'unless a different meaning is apparent from the context or the plain meaning leads to absurd or nonsensical results.'" *Jaster*, 438 S.W.3d at 562 (quoting *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011)). "In determining the ordinary and common meaning of an undefined word in a statute, we may consider a variety of sources, including dictionary definitions, judicial constructions of the term, and other statutory definitions." *Colorado County v. Staff*, 510 S.W.3d 435, 448, 2017 WL 461363, at *9 (Tex. 2017).

Black's Law Dictionary defines "applicable" as "[f]it, suitable, pertinent, related to, or appropriate; capable of being applied." *Applicable, Black's Law Dictionary* 98 (6th ed. 1990).[7] The Oxford English Dictionary defines "applicability" as "[t]he quality of being applicable; capability of being fitly applied; pertinence." *Applicability, Compact Oxford English Dictionary* 64 (2d ed. 1987). Thus, the question of wheth-

er a rule is "applicable" asks whether that rule may be applied to a factual situation or whether it is inappropriate or irrelevant to the situation.

"Application," on the other hand, is defined as "[t]he use or disposition made of a thing. A bringing together, in order to ascertain some relation or establish some connection; as the *application* of a rule or principle to a case or fact." *Application, Black's Law Dictionary* 98–99.[8] An inquiry into the "application" of a rule would ask how the rule should be applied. In other words, such an inquiry would consider the specific outcome after a rule's application.

Thus, inquiring into a rule's "applicability" is not the same as inquiring into its "application." To the extent that our language in *ElderCare Properties, City Public Service Board*, or *City of Alvin* might be used to imply otherwise, we disavow that interpretation and instead reiterate that a trial court has jurisdiction under section 2001.038 to determine (1) whether the rule is valid and (2) whether it is "applicable"; section 2001.038 does not grant the court jurisdiction to go beyond those questions to determine whether the agency complied with the rule. *See Friends of Canyon Lake, Inc. v. Guadalupe–Blanco River Auth.*, 96 S.W.3d 519, 529 (Tex. App.–Austin 2002, pet. denied); *Texas Dep't of Transp. v. City of Sunset Valley*, 92 S.W.3d 540, 549 (Tex. App.–Austin 2002), *rev'd on other grounds*, 146 S.W.3d 637 (Tex. 2004); *see also State v. BP Am. Prod. Co.*, 290 S.W.3d 345, 362 (Tex. App.–Austin 2009, pet. denied) ("the remedy af-

---

7. "Applicable" is elsewhere defined as "[c]apable of being applied; having reference," or "[f]it or suitable for its purpose; appropriate," *Applicable, Compact Oxford English Dictionary* 64 (2nd ed. 1987), and as "capable of being applied: having relevance," "fit, suitable, or right to be applied," *Applicable, Webster's Third New Int'l Dictionary* 105 (2002).

8. "Application" is elsewhere defined as "[t]he putting of any thing to a use or purpose; employment; specific use," or "[t]he bringing of a law or theory ... to bear upon a particular case, or upon matters of practice generally, *Application, Compact Oxford Dictionary* 64, and as 'the act of applying,'" "the part of a discourse in which principles stated previously are applied to practical uses," *Application, Webster's Third New Int'l Dictionary* 105.

forded by section 2001.038 is limited to declarations concerning the *rule*—that the rule is null and void, in the case of a validity challenge, or that the rule did not impose a right, duty, or obligation on the plaintiff, in the case of an applicability challenge").

LMV sought a declaration of *how* Rule 92.62 should be applied to its facility, not *whether* the rule applied to the facility. In other words, it asked the trial court to determine whether DADS complied with Rule 92.62 in its licensing of the LMV facility. Such a question is not within the trial court's jurisdiction under section 2001.038. *See City of Sunset Valley*, 92 S.W.3d at 549.

Because LMV did not challenge the "validity or applicability" of a rule, it did not invoke the trial court's jurisdiction under section 2001.038, nor can it plead a valid section 2001.038 claim on these facts. We reverse the trial court's order granting summary judgment on LMV's section 2001.038 claims and render judgment dismissing those claims for want of jurisdiction. *See Texas A & M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007) (pleader should only be given opportunity to replead "if it is possible to cure the pleading defect"); *Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality*, 307 S.W.3d 505, 526 (Tex. App.–Austin 2010, no pet.) (courts should not allow party to replead if alleged facts affirmatively negate jurisdiction).

### Jurisdiction Under the UDJA

▮ DADS next argues that LMV did not allege an ultra vires act by its commissioner.[9] We agree.

▮ "[I]n certain narrow instances, a suit against a state official can proceed even in the absence of a waiver of immunity if the official's actions are *ultra vires*." *Hall v. McRaven*, 508 S.W.3d 232, 238 (Tex. 2017); *see Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016). To fall within the ultra vires exception to immunity, a plaintiff cannot attack an official's exercise of discretion but instead must allege that the official acted without legal authority, which includes an act that exceeds the official's legal authority or conflicts with the law itself, or did not perform a purely ministerial act. *Hall*, 508 S.W.3d at 238–39 (quoting *Houston Belt*, 487 S.W.3d at 158; *City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009)). When an official is granted discretion to interpret the law, an act is not ultra vires merely because it is erroneous—"[o]nly when these improvident actions are *unauthorized* does an official shed the cloak of the sovereign and act *ultra vires*." *Id.* at 243. "[M]erely asserting legal conclusions or labeling a defendant's actions as 'ultra vires,' 'illegal,' or 'unconstitutional' does not suffice to plead an ultra vires claim—what matters is whether the *facts* alleged constitute actions beyond the governmental actor's statutory authority, properly construed." *Sunset Transp., Inc.*, 357 S.W.3d at 702.

Although LMV attempts to frame its arguments as asserting that the Commissioner acted outside his delegated authority, the legislature specifically granted DADS the authority to regulate assisted living facilities and to adopt rules relating

9. DADS also asserts correctly that the UDJA does not provide for challenges to an agency's rules or interpretations of a rule. *See Texas Educ. Agency v. American YouthWorks, Inc.*, 496 S.W.3d 244, 267 (Tex. App.–Austin 2016, pet. filed); *Texas State Bd. of Veterinary Med. Exam'rs v. Giggleman*, 408 S.W.3d 696, 708 (Tex. App.–Austin 2013, no pet.). LMV does not contend that it is challenging DADS's rules under the UDJA, only that it asserts ultra vires claims against the Commissioner.

to the construction and operation of such facilities. *See* Tex. Health & Safety Code § 247.0011; *see generally id.* §§ 247.001–.098 ("Assisted Living Facility Licensing Act"). The Assisted Living Facility Licensing Act is intended to ensure that assisted living facilities "deliver the highest possible quality of care," and to that end, establishes minimum acceptable levels of care. *Id.* § 247.0011(a). The Commissioner is directed to adopt rules relating to quality of care, quality of life, and "the assessment of the condition and service needs of each resident." *Id.* § 247.0011(b). DADS is required to "promot[e] policies that maximize the dignity, autonomy, privacy, and independence of each resident," "regulat[e] the construction, maintenance, and operation of assisted living facilities," and "impos[e] prompt and effective remedies for violations of this chapter and rules and standards adopted under this chapter," among other duties. *Id.* § 247.0011(b–1). Implicit in the Assisted Living Facility Licensing Act is DADS's authority to interpret the rules and statutes it must administer and enforce. *See Texas Dep't. of Ins. v. Reconveyance Servs., Inc.*, 240 S.W.3d 418, 431 (Tex. App.–Austin 2007), *rev'd on other grounds*, 306 S.W.3d 256 (Tex. 2010); *see also Enterprise Leasing Co. v. Harris Cty. Toll Rd. Auth.*, 356 S.W.3d 85, 92 (Tex. App.–Houston [1st Dist.] 2011, no pet.) (toll authority was "authorized by the statute to administer and enforce toll road charges," and its interpretation of statute was "fair interpretation of the statutory requirements by the enforcing agency"); *Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 267 (Tex. App.–Austin 2002, no pet.) (agency "is expressly authorized by the Insurance Code to regulate insurance policies and insurer claim practices" and therefore has authority to construe provisions related to promulgation of insurance forms).

■ The fact that LMV disagrees with DADS's interpretation of its rules does not mean that the Commissioner acted without authority in implementing that interpretation. *See Hall*, 508 S.W.3d at 242–43; *Creedmoor–Maha Water Supply*, 307 S.W.3d at 517–18; *North Alamo Water Supply Corp. v. Texas Dep't of Health*, 839 S.W.2d 455, 459 (Tex. App.–Austin 1992, writ denied). "When the ultimate and unrestrained objective of an official's duty is to interpret collateral law, a misinterpretation is not overstepping such authority; it is a compliant action even if ultimately erroneous." *Hall*, 508 S.W.3d at 243; *see MHCB (USA) Leasing & Fin. Corp. v. Galveston Cent. Appraisal Dist.*, 249 S.W.3d 68, 81 (Tex. App.–Houston [1st Dist.] 2007, pet. denied) ("just because an agency determination is wrongly decided does not render that decision outside the agency's authority," and incorrect determination "rendered *pursuant* to the agency's authority is not a determination made *outside* that authority"). As we have said, "if the plaintiff alleges only facts demonstrating acts within the officer's legal authority and discretion, the claim seeks to control state action, and is barred by sovereign immunity." *Creedmoor–Maha Water Supply*, 307 S.W.3d at 515–16; *see Houston Belt*, 487 S.W.3d at 164 ("[W]hether a suit attacking an exercise of limited discretion will be barred is dependent upon the grant of authority at issue in any particular case. And so many legislative grants of authority, although not absolute, will be broad enough to bar most, if not all, allegedly *ultra vires* claims."); *see also Hall*, 508 S.W.3d at 243 ("As important as a mistake may be, sovereign immunity comes with a price; it often allows the 'improvident actions' of the government to go unredressed.").

LMV has not shown that the Commissioner acted without legal authority or failed to perform a purely ministerial act.

See Hall, 508 S.W.3d at 242–43; Heinrich, 284 S.W.3d at 372. Instead, it simply disagrees with the manner in which the agency's discretion under chapter 247 was employed, in essence seeking to exert control over DADS's decision-making rather than regaining control from an agency run amok. See Heinrich, 284 S.W.3d at 372. We sustain DADS's appeal as to LMV's claims under the UDJA and render judgment dismissing those claims for want of jurisdiction.

## Constitutional Claims

The parties give scant attention to LMV's claims of due process violations, but because sovereign immunity does not bar a party from seeking judicial review of an agency's action that is alleged to violate a vested property or other constitutional right, we next turn to those claims. See In re Office of the Attorney Gen., 456 S.W.3d at 157.

Although "administrative rules violate due process when they are arbitrary and capricious," Texas Workers' Comp. Comm'n v. Patient Advocates of Tex., 136 S.W.3d 643, 659 (Tex. 2004), "[d]ue process does not require judicial review of an administrative decision," and "[j]udicial intervention is only required when there is state deprivation or regulation of a fundamental interest, or some other statutory or common law basis for legal action exists," Burkhalter v. Texas State Bd. of Med. Exam'rs, 918 S.W.2d 1, 3 (Tex. App.–Austin 1996, no writ). Thus, our first step in considering a due process claim is to ask whether the plaintiff has been deprived of a constitutionally protected property or liberty interest. Klumb v. Houston Mun. Emps. Pension Sys., 458 S.W.3d 1, 15 (Tex. 2015); Texas Educ. Agency v. American YouthWorks, Inc., 496 S.W.3d 244, 260 (Tex. App.–Austin 2016, pet. filed). "A property or liberty interest must find its origin in some aspect of state law." Spring Branch Indep. Sch. Dist. v. Stamos, 695 S.W.2d 556, 561 (Tex. 1985). "A constitutionally protected right must be a vested right, which is 'something more than a mere expectancy based upon an anticipated continuance of an existing law.'" Klumb, 458 S.W.3d at 15 (quoting City of Dallas v. Trammell, 129 Tex. 150, 101 S.W.2d 1009, 1014 (1937)).

"Under long-established Supreme Court jurisprudence, a benefit is not a protected entitlement if government officials may grant or deny it in their discretion. 'Some substantive limit on the State's discretion is an essential characteristic of a property interest warranting constitutional protection.'" American YouthWorks, 496 S.W.3d at 261 (quoting Grounds v. Tolar Indep. Sch. Dist., 856 S.W.2d 417, 418 (Tex. 1993)). "A license is merely a permit or privilege to do what otherwise would be unlawful. The object of a license is to confer a right or power which does not exist without it." Payne v. Massey, 145 Tex. 237, 196 S.W.2d 493, 495 (1946); see Riley v. Texas State Bd. of Exam'rs of Prof'l Counselors, 315 S.W.3d 135, 140 (Tex. App.–Austin 2010, pet. denied) ("Assuming without deciding that Riley had a property interest in her [professional counseling] license warranting protection under the federal and state constitutions, . . . Riley's license expired in accordance with its statutory expiration date and Riley did not comply with the statutory renewal procedures. Therefore, the expiration of Riley's license did not cause the loss of a protected property right."); Sefzik v. Texas Dep't of Transp., 267 S.W.3d 127, 138 (Tex. App.–Corpus Christi 2008), rev'd in part on other grounds, 355 S.W.3d 618 (Tex. 2011) (permit application seeking to erect outdoor advertising sign "merely sought a governmental benefit to which he was not already entitled. As such, Sefzik

merely had an expectation of the governmental benefit—his expectation is not a protected property right."); *Limon v. State*, 947 S.W.2d 620, 626 (Tex. App.–Austin 1997, no writ) (permit or license is generally "a mere personal privilege granted by the legislature," and licensee may at best have due process interests in its "right to conduct business *during the term such right was granted*").

On appeal, LMV does not explain exactly what constitutionally protected rights are at issue, nor does it cite to any such pleadings before the trial court. In its petition, LMV argued under section 2001.038 (1) that DADS's "interpretation violates substantive and/or procedural due process guaranteed by" both the state and federal constitutions and (2) that DADS's "secret rule" "interfere[d] with and impair[ed] the legal rights and privileges of Plaintiff (a) to the fair and faithful application of the plain language of [Rule 92.62] to its application for double occupancy and (b) to be free from arbitrary and capricious action by a state agency." In its later filings, LMV slightly expanded on its constitutional arguments, asserting that DADS's "secret rule" violated procedural and substantive due process considerations; that DADS's "de facto rulemaking is arbitrary and capricious"; that DADS had violated procedural due process requirements because it did not "comply with the plain language of its own rules in making the determination of occupancy" or give LMV prior notice of its "secret method of measuring 'usable floor space' "; and that "[t]he process was fundamentally unfair and rigged against LMV because DADS'[s] secret rule resulted in the arbitrary exclusion of 'usable floor space' that LMV reasonably believed would be included based on DADS'[s] own rules." DADS, meanwhile, argued in its brief in support of its plea to the jurisdiction and cross-motion for summary judgment that Rule 92.62 was in no way a "secret rule" and that its interpretation of Rule 92.62 was reasonable and also not a "secret rule." DADS went on to assert that LMV did not have a "legal, equitable, or statutory right to double occupancy," that seeking double occupancy to earn increased revenue "does not give rise to protected interest in an initial license," and that an expectation interest in increased revenue was not a protected interest, concluding, therefore, that LMV's constitutional claims were meritless.

It is not sufficient for a plaintiff to merely "plead legal conclusions to the effect that [an agency] 'violated due process' by 'depriving' [it] of property rights," and it must instead "present *facts* that would constitute due-process violations." *Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 181 (Tex. App.–Austin 2013, no pet.). Mere legal conclusions of unspecified property rights, however, are exactly what LMV's pleadings present. Further, we have already held that DADS's interpretation of Rule 92.62 is not a "rule" in and of itself. Finally, DADS is correct that an expectation or hope that the thirty rooms would be approved for double occupancy does not rise to the level of a vested property right protected by constitutional due process considerations. *See Southwest Pharmacy Sols., Inc. v. Texas Health & Human Servs. Comm'n*, 408 S.W.3d 549, 564–65 (Tex. App.–Austin 2013, pet. denied) (pharmacy company did not have right to rate it had been paid under prior regulatory scheme); *Elder-Care Props.*, 63 S.W.3d at 556 (nursing home did not have vested property right to additional Medicaid beds or to " 'optimiz[e]' the value of its Medicaid contract"; such claims were "mere expectation[s] 'based on an anticipated continuance of existing law' "); *S.C. San Antonio, Inc. v.*

*Texas Dep't of Human Servs.*, 891 S.W.2d 773, 778 (Tex. App.–Austin 1995, writ denied) (hospital did not have vested property right to "additional reimbursement" and "had no more than an expectancy of receiving" it because any rights it had "were contingent on a comparison of Southwest General's level of services to indigent patients with that of other hospitals").[10]

Because LMV has no vested or otherwise protected right to double-occupancy approval in the thirty rooms in question, which is the only arguable right presented by the facts of this case, the trial court did not err in granting summary judgment on LMV's claims of due process violations. We sustain the trial court's order granting summary judgment on LMV's constitutional claims.

### Conclusion

The trial court should have granted DADS's plea to the jurisdiction as to LMV's assertions of "secret" rulemaking and its challenges to DADS's interpretation of Rule 92.62 under the APA and UDJA. We therefore reverse in part the trial court's order granting DADS's motion for summary judgment and render judgment dismissing those claims for want of jurisdiction. Because LMV did not plead or prove that it had a constitutionally protected property interest in obtaining double-occupancy approval, we affirm the trial court's order granting summary judgment for DADS on LMV's remaining claims. Due to our disposition of the other issues

presented, we need not consider LMV's complaints related to the trial court's sustaining DADS's objections to some of LMV's summary judgment evidence.

---

10. "[P]roperty interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents ·of State Colls. v. Roth*, 408 U.S. 564, 571–72, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In *Roth*, the Supreme Court noted that protected property interests have the following "[c]ertain attributes": "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. 2701; *see also American YouthWorks*, 496 S.W.3d at 260 (" 'Property' in the constitutional sense is a label applied to a benefit when an individual possesses a 'legitimate entitlement' to the benefit under 'existing rules or understandings' " that "arise from sources independent of the Constitution, such as state statutes, the common law, and contracts.").